Gordon M. Fauth, Jr. (SBN 190280)
gfauth@finkelsteinthompson.com
Of Counsel
Rosanne L. Mah (Cal. Bar No. 242628)
rmah@finkelsteinthompson.com
Of Counsel
**FINKELSTEIN THOMPSON LLP**
100 Pine Street, Suite 1250
San Francisco, California 94111
Direct Telephone: (510) 238-9610
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

Attorneys for Individual and Representative
Plaintiff Christina Labajo

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CHRISTINA LABAJO, an Individual, on behalf of herself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** |
| vs. | |
| FACEBOOK, INC. and CAMBRIDGE ANALYTICA, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Christina Labajo, individually and on behalf of all others similarly situated, by and through her undersigned counsel, for her complaint brings this class action for damages and equitable relief against Defendants Facebook, Inc. and Cambridge Analytica. Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge:

1

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**NATURE OF THE ACTION**

1.      This is a civil action brought by Plaintiff Christina Labajo ("Labajo" or "Plaintiff") on behalf of herself and all others similarly situated against Defendants Facebook, Inc. ("Facebook") and Cambridge Analytica ("Cambridge Analytica") (collectively "Defendants"). In this action, Plaintiff alleges that in June-August 2014 Facebook allowed a massive data breach in which the sensitive personal information of Plaintiff and 87 million Facebook users (including 71 million Americans) was misappropriated by Cambridge Analytica and other entities and used for unauthorized purposes, including attempts to influence the 2016 United States presidential election (the "Data Breach" or "2014 Data Breach"). Plaintiff further alleges that for years, Facebook allowed hackers to exploit known vulnerabilities in its network to "scrape" data from users' profiles, violating their privacy and placing them at risk for identity theft.

2.      Facebook is a popular Internet social networking service located at www.facebook.com. Facebook has more than two billion users worldwide.[1] Facebook allows registered users to utilize their Facebook accounts and timeline pages to share information with and communicate with friends, family, and colleagues. Facebook users create customized profiles and pages containing highly personal information, including their name, home address, email address, telephone numbers, birthdate, gender, interests, relationships, photographs and videos, "likes" and other information (hereafter, "Personal Information"). Facebook users can share this Personal Information and exchange messages with other users.

3.      Cambridge Analytica is a political consulting firm engaged in data mining, data analysis and consulting on behalf of political clients, in an effort to influence the outcomes of elections.[2] Notably, it was hired to provide data and analytical services, first to the Ted Cruz primary campaign and then to the 2016 presidential campaign of Donald Trump. Among other things, Cambridge Analytica used Facebook users' personal data to build "psychographic" profiles so that these potential voters could be targeted with tailored advertising messages

---

[1] *See* https://en.wikipedia.org/wiki/Facebook (last visited March 25, 2018).

[2] *See* https://en.wikipedia.org/wiki/Cambridge Analytica_Analytica#cite_note-ca-9 (last visited March 25, 2018).

2

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

designed to influence their voting.

4.      Facebook falsely promised its users their Personal Information would be protected and not shared with others except as they authorized. In fact, Facebook knew its security was inadequate to protect users' data, and that its default settings and available tools coupled with security vulnerabilities made it easy for hackers to gain access to users' information.  Also, Facebook had a policy of selling user data to third parties and even implemented APIs to allow third-party apps to "harvest" user information for their own purposes.

5.      On March 17, 2018, the *New York Times* and *The Guardian* reported that Cambridge Analytica had gained access to the "harvested" Personal Information of more than 50 million Facebook users, which had been taken in a massive data breach in 2014. The stolen information was, among other things, used to construct psychological profiles of the Facebook users, so that they could be targeted with advertising in an attempt to influence their voting in the 2016 presidential election.

6.      After initially threatening legal action in an attempt to suppress the news reports, once the news was published, Facebook was forced to concede the data breach had taken place. On April 4, 2018, Facebook admitted that the data breach was even larger than reported, and that as many as 87 million Facebook users, the vast majority in the United States, had their Personal Information stolen.

7.      In a further revelation on April 4, 2018, Facebook disclosed that, in addition to the Cambridge Analytica data breach, "malicious actors" had for years been using search tools on its platform to "scrape" identities and other profile information on "most" of its 2 billion users worldwide.

8.       The Cambridge Analytica data theft occurred June through August 2014.  The data "harvesting" was done by recruiting a Cambridge University researcher to develop an app called ThisIsYourDigitalLife, with financial backing from Cambridge Analytica, which was used to access Facebook users' Personal Information. Misleadingly billed as a "personality quiz" given as part of a research project, participants were promised a personality assessment. Some 270,000 Facebook users were tricked into using the app, and Facebook allowed the app to harvest not only their Personal Information but also the Personal Information of each of those

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

user's circles of Facebook "friends." Because of this multiplying effect, the Data Breach resulted in the theft of the Personal Information of 87 million Facebook users, 71 million of them in the United States.

9.     Even though Facebook knew of the 2014 Data Breach and its extent in 2015 and perhaps earlier, Facebook failed to disclose the breach to the owners of the stolen Personal Information or to the public. Facebook acknowledged the breach and its extent only after the news media published reports of the data breach in March 2018. On March 21, 2018, Facebook CEO Mark Zuckberg conceded the breach had happened and admitted it constituted a "breach of trust between Facebook and the people who share their data with us and expect us to protect it."[3]

10.     Facebook has failed to protect personal and private information entrusted to it by Plaintiff and other consumers, and has allowed this highly sensitive information to be "harvested," misappropriated and misused. Because of the 2014 Data Breach, the privacy of Plaintiff and millions of Facebook users has been invaded, and their Personal Information is in the hands of Cambridge Analytica and unknown others and, according to experts, is likely to be proliferating out on the "dark web." Because of the data "scraping" that Facebook has allowed to happen for years, personal and private information of virtually all Facebook users is now in the hands of unknown hackers. These Facebook users have not only had their privacy invaded, they now must live under the continual threat of their personal and private information being used for identity theft and other nefarious purposes.

11.     Plaintiff and other Facebook users in California and across the United States have suffered harm because of Facebook's failure to take adequate security measures to protect their personal and private information and because Facebook allowed the misappropriation of their sensitive data. Facebook's failure to disclose to Plaintiff and other Facebook users that it did not adequately protect information entrusted to it, its malfeasance in allowing their data to be taken, and its failure to disclose the occurrence of the data theft and the scope of the theft until the news media left it little choice, are made the more egregious by the fact that Facebook in 2011 entered into a consent decree settlement of an FTC action in which Facebook was accused of allowing

---

[3] *See* https://www.facebook.com/zuck/posts/10104712037900071 (last visited March 25, 2018).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

user data to fall into the wrong hands. As part of the settlement, Facebook promised to take effective measures to guard against user information being compromised. Nonetheless, Facebook willfully chose not to take the measures that it knew were necessary to protect the sensitive user data in its keeping, and instead allowed hackers and third-party apps to access the personal and private information of users; and as a result has caused harm to Plaintiff and Class members.

12.      Defendants' actions and omissions violate laws including the Security Breach Notification Law, Cal. Civil Code § 1798.82; the Customer Records Act, Cal. Civ. Code § 1798.81.5; the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; the Electronic Communications Privacy Act, 18 U.S.C §§ 2511 *et seq;* the Stored Communication Act, 18 U.S.C § 2701, *et seq.* and constitute negligence, misappropriation, and unjust enrichment.

13.      Accordingly, Plaintiff brings this case on behalf of herself and other similarly situated persons and seeks damages including compensatory and statutory damages, punitive damages, and equitable relief, declaratory relief, and attorney fees and costs.

## JURISDICTION AND VENUE

14.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because claims under federal law are pleaded, and pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of each of the proposed Classes exceeds 100; and many class members are citizens of states different from the states of which Defendants are citizens.

15.       This Court has personal jurisdiction over the Defendants because they conduct substantial business in the State of California and in this Judicial District and/or the conduct complained of occurred in and/or emanated from this State and Judicial District.

16.      Venue is proper in this Judicial District because Defendants conduct substantial business in this Judicial District and/or the conduct complained of occurred in or emanated from this District.

## INTRADISTRICT ASSIGNMENT

17.      Venue is proper in this Judicial District and the San Jose division thereof pursuant to 28 U.S.C. section 1391 subsections (b) and (c), and Civil L.R. 3-2 subsections (c) and (d). Defendants transact business in this division and County and/or a substantial part of the events

5

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

giving rise to the claims at issue in the litigation arose in this division and County.

## PARTIES

### Plaintiff

18.     Plaintiff Christina Labajo is and has at all relevant times been a resident of California. Plaintiff has held a Facebook account since 2009.

19.      Plaintiff's Personal Information was misappropriated by Cambridge Analytica in the Data Breach complained of herein, and as a result Plaintiff was subjected to unwanted and misleading, targeted political ads designed to brainwash and improperly influence her vote during the 2016 Presidential election. Plaintiff also had her profile information taken by unknown entities in the "scraping" revealed by Facebook on April 4, 2018. Plaintiff was injured because her personal information was collected and misused in violation of Facebook's promises of protection of her privacy.  Plaintiff was also injured because her personal information stored on Facebook had commercial value, and that value was misappropriated and employed for the profit of Defendants.

20.     Plaintiff did not give consent to the sharing of her Personal Information with Cambridge Analytica or unknown hackers.

### Defendants

21.     Defendant Facebook, Inc. is a Delaware corporation with headquarters in Menlo Park, California. Its primary business consists of providing online social networking service to its users and selling advertising to businesses who want to reach its users. Facebook states that its mission is to "[g]ive people the power to build community and bring the world closer together." Founded on February 4, 2004, Facebook has grown to have more than two billion users worldwide. It employs over 25,000 employees. It has over 50 offices and 12 data centers throughout the world.

22.     Facebook's revenues come from advertising directed to its users and from providing user information to third party entities. In 2017, Facebook's revenues were $40.65 billion. Traded publicly on Nasdaq (Symbol: FB), Facebook has a market cap of $464 billion.

23.     Defendant Cambridge Analytica is a London-based privately held company with offices in New York, Washington, D.C., and London. Cambridge Analytica is a subsidiary of

6

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Strategic Communications Laboratories ("SCL"), a British company whose stated purpose is to "create behavior change through research, data analytics, and strategy for both domestic and international government clients." Cambridge Analytica was formed in 2013, with funding from hedge-fund billionaire Robert Mercer, and co-founder alt-right publisher and strategist Steve Bannon as vice-president, specifically to use SCL technology to influence the American political process. Cambridge Analytica has performed voter data analysis services for numerous political campaigns in the United States, including the 2016 presidential campaign of Donald Trump.

24.      Cambridge Analytica uses data mining and analysis to formulate "strategic communications" aimed at voters in an effort to influence the electoral process. Alexander Nix, Cambridge Analytica's CEO, has admitted the company uses tricks to influence elections.[4] "This January, in undercover footage filmed by Channel 4 News in Britain and viewed by The Times, he boasted of employing front companies and former spies on behalf of political clients around the world, and even suggested ways to entrap politicians in compromising situations." [5]

## TOLLING OF STATUTES OF LIMITATION

25.      Plaintiff and Class members did not, and even with diligent effort could not have, learned of the 2014 Data Breach and misuse of their Personal Information complained of herein until it was reported in the news media on March 17, 2018, and with respect to the "scraping" of profile information by as-yet-unknown hackers, until Facebook's revelations on April 4, 2018. Accordingly, all applicable statutes of limitation are tolled and do not begin to run until March 17 and April 4, 2018.

## SUBSTANTIVE ALLEGATIONS COMMON TO ALL CAUSES OF ACTION
### The Facebook Social Media and Networking Site

26.      Facebook operates a popular social media and networking site, located at www.facebook.com.  Facebook was founded in 2004 by CEO Mark Zuckerberg, then an

---

[4] *See* https://www.theguardian.com/uk-news/2018/mar/19/Cambridge Analytica-analytica-execs-boast-dirty-tricks-honey-traps-elections (last visited March 25, 2018).

[5] *How Trump Consultants Exploited the Facebook Data of Millions,*
https://www.nytimes.com/2018/03/17/us/politics/Cambridge Analytica-analytica-trump-campaign.html (last visited 3/30/18).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

undergraduate student at Harvard University, as a social networking service for Harvard college students.  The founders, essentially Zuckerberg and his roommates, called the online service "Facebook" after the paper book directory colleges gave to their students. Facebook first expanded to other elite colleges, then quickly expanded beyond the student world, growing into the world's premier social networking site.  Facebook now has "2.13 billion monthly active users as of December 31, 2017."[6]

27.     Users establish accounts on Facebook and set up a Profile containing personal information about themselves. Facebook gives each user a Timeline or user page that other Facebook users can visit. The Timeline is a reverse-chronology blog:

> "Timeline is a section of a Facebook user's account that replaces the Profile and Wall pages, and merges them together. It shows the story of your life, as you choose to tell it or as Facebook has recorded it, in a visual, scrolling, reverse-chronologically ordered timeline. It's a cross between visual blog and online scrapbook."[7]

28.     On the user's Timeline page, certain profile information appears, and users also post additional personal information and news, photos, videos and other Personal Information. Users typically maintain their pages as a type of constantly updated blog. Facebook facilitates messaging between users and offers participation in online games as well as furnishing a variety of other services to users.

29.     Facebook members can generally specify whether personal information they give Facebook or information they post on their Timeline page can be seen by all Facebook users, only Facebook users they have accepted as "Friends," Friends with certain exceptions, or only selected Friends. Depending on settings, users' news postings may also appear automatically on all of their Friends' pages. Users can also post on Friend's pages, subject to deletion by the Friend. Users send "Friend Requests" to other users, which may be accepted or rejected. Facebook advises:

---

[6] *See* https://newsroom.fb.com/company-info/ (last visited March 26, 2018).

[7] *12 Things You Should Know About Facebook Timeline, at* https://www.pcmag.com/article2/0,2817,2393464,00.asp (last visited 3/30/18).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1      "You should send friend requests to friends, family and other people on Facebook you
2      know and trust. You can add a friend by searching for them and sending them a friend
3      request. If they accept, you automatically follow that person, and they automatically
     follow you — which means that you may see each other's posts in News Feed."

4         30.    A Facebook user will typically have a wide circle of Friends, changing constantly

5 as new Friends are made or old Friends unfriended. A Facebook visitor to a user's page may

6 click to "like" or select other emoticons to indicate their feelings concerning the user's postings

7 and content.  The acrimony and perceived snubs involved in the interaction and

8 Friending/Unfriending process has contributed significantly to the anxiety levels of many

9 Facebook users, particularly the younger ones.

10         31.    Anyone who says they are at least 13 years is allowed to open a Facebook

11 account, except where prohibited by local laws.

12 **Facebook is Big Business**

13         32.    Facebook's service is free for consumer users.  However, Facebook generates

14 enormous revenues. Facebook derives its revenues from advertisers who pay Facebook for

15 popup ads targeted to its users based on their Profile information and from third party entities

16 that pay for Facebook users' data.  As Facebook tells advertisers, "With our powerful audience

17 selection tools, you can target the people who are right for your business. Using what you know

18 about your customers—like demographics, interests and behaviors—you can connect with

19 people similar to them."[8]

20         33.    Advertising is a lucrative business for Facebook. In 2017, Facebook's revenues

21 from advertising were $ $40.65 billion, up from $26.89 billion in 2016.  Most of Facebook's

22 revenue comes from popup or banner ads.  However, Facebook also derives revenue from selling

23 third parties "firehose" bulk access to Facebook users' data.[9]

24 **Consumers Entrust Facebook With Their Personal Information**

25         34.    Users are encouraged to provide profile information and post personal

26

27 [8] *See* https://www.facebook.com/business/products/ads/ad-targeting (last visited 3/29/2018).

28 [9] *See* Wikipedia *at* https://en.wikipedia.org/wiki/Facebook (lasted visited 3/29/2018).

9

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

information about themselves, including their name, home address, email address, telephone numbers, birthdate, gender, interests, relationships, photographs and videos, activities, "likes" and other information. In addition to viewing posted information, users may use their Facebook account to send messages and communicate with each other. Facebook allows people to "stay connected" with friends, family, and colleagues to "discover what's going on in the world," and to share information and "express what matters to them."[10]

35.    Users provide Facebook with their profile and Personal Information, believing it will be protected from unauthorized disclosure and misuse. Facebook promises to give members the ability to control and manage their privacy. "You have control over who sees what you share on Facebook…You're In Charge…so you can confidently share your moments."[11]

36.    Facebook assures its users that their profile and Personal Information is protected from hackers and misappropriation. Facebook states it has "top-rate security measures in place to help protect you and your data when you use Facebook."[12] Facebook assures its users that "[w]hen it comes to your personal information, we don't share it without your permission."[13]

**Facebook's Inadequate Security Measures and Willful and Negligent Practices**

37.    Contrary to its assurances to Facebook users that their sensitive information was protected and safe, in fact, Facebook willfully, recklessly and negligently made its users' data including their profile and Personal Information accessible to third-party entities, for its own profit and/or through its reckless practices and policies.

38.    In addition to allowing advertisers to target Facebook users on their Facebook pages with directed advertising based on users' profile and demographic information, Facebook also derives revenues from providing third party entities with bulk access to Facebook users' data. To facilitate such data acquisition, in 2010, Facebook launched its Open Graph API, to

---

[10] *See* https://investor.fb.com/resources/default.aspx (last visited March 26, 2018).

[11] *See* https://www.facebook.com/about/basics (last visited March 26, 2018).

[12] *See* https://www.facebook.com/about/basics/stay-safe-and-secure/how-youre-protected (last visited March 26, 2018)

[13] *See* https://www.facebook.com/about/basics/stay-safe-and-secure/how-youre-protected#4 (last visited March 26, 2018).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

allow outside app developers to access user data.  Facebook allows third-party entities to use apps to gain access to the Personal Information of users who have ostensibly consented to the app's access. In some cases, these third-party app developers may even gain access to a user's private messages.

39.     At the same time that it shared user date with other entities, Facebook deliberately made it difficult for users to understand that they were sharing personal information with outside entities, or to understand what information would be shared. This was particularly true at the time of the 2014 data breach. For example, in or around 2012, Facebook changed the options on the permissions page for games from "Allow" and "Don't Allow" to simply "Play Game." "Play Game" did not communicate clearly to users that, by using a game app, they were opting into sharing data. Facebook also hid its explanation of what it considered "basic information" that would be routinely shared underneath a small "?" symbol that users needed to hover over to read.

40.     By default, users' accounts settings failed to provide even the protection that was available to Facebook users, and Facebook failed to notify users of the dangers and adequately explain the options available to protect their data.

41.     Worse, at the time of the 2014 Data Breach complained of herein, Facebook allowed third-party entities to use apps to harvest the Personal Information not just of users who had purportedly (according to Facebook) "consented" to the app's intrusion but also the Personal Information of other Facebook users who were those users' Friends. Since Facebook users each typically have a wide circle of Friends, this policy greatly multiplied the number of users whose Personal Information Facebook made available for harvesting by third-party apps.

42.     Also, as now revealed, Facebook has for years allowed hackers to gain access to user data utilizing known vulnerabilities in the Facebook network, including using Facebook's own search tools to access user data. By allowing this "scraping" of user data and profile information, Facebook has facilitated the invasion of the privacy of virtually all its users, placing them at risk for identity theft.

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### ThisIsYourDigitalLife App Used to Steal Personal Information of 87 Million Facebook Users

**Used By Cambridge Analytica in Attempt to Influence 2016 Presidential Election**

43.     On March 17, 2018, the *New York Times* and *The Guardian* reported that Cambridge Analytica had gained possession of the Personal Information of more than 50 million Facebook users in the United States that it acquired as the result of a massive 2014 data breach in which the Profile information of these users had been downloaded from Facebook ("Data Breach" or "2014 Data Breach"). On April 4, 2018, Facebook revealed that as many as 87 million users, including 71 million Americans, had their Personal Information taken in this Data Breach.

44.     As reported in the *New York Time* and *The Guardian*, the massive Data Breach took place in 2014.  Cambridge Analytica used the purloined Personal Information -- which represented nearly a third of potential U.S. voters -- to construct psychological profiles of those Facebook users which it then used to formulate strategies and direct tailored advertising on behalf of dozens of political campaign clients, including the Ted Cruz presidential campaign.

45.     In 2016, after Senator Cruz dropped out of the race, the Donald Trump presidential campaign hired Cambridge Analytica to provide analytical and other services; and Cambridge Analytica used the stolen Personal Information and the "psychographic" profiles it created from the data to direct political ads and messages to Facebook users in an attempt to sway swing voters and influence the presidential election.

46.     As explained by Christopher Wylie, a former Cambridge Analytica employee turned whistleblower, "We exploited Facebook to harvest millions of people's profiles. And built models to exploit what we knew about them and target their inner demons. That was the basis the entire company was built on."[14]

47.     The March 17, 2018 reports on the Data Breach were in large part made possible by information provided to *The Guardian* by Christopher Wylie who, while employed by

---

[14] See https://www.theguardian.com/news/2018/mar/17/Cambridge Analytica-analytica-facebook-influence-us-election (last visited March 26, 2018).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Cambridge Analytica, had been intimately involved in the scheme to acquire and use Facebook user data:

> Aged 24, while studying for a PhD in fashion trend forecasting, he came up with a plan to harvest the Facebook profiles of millions of people in the US, and to use their private and personal information to create sophisticated psychological and political profiles. And then target them with political ads designed to work on their particular psychological makeup.[15]

48.     As a result of having their Personal Information taken in the Data Breach, Plaintiff and members of the Classes were subjected to unwanted, false and misleading, targeted political ads during the 2016 Presidential election while using Facebook.

### How the 2014 Data Breach Happened

49.     In the June-August 2014 Data Breach, the Personal Information of Plaintiff and 87 million Facebook users (71 million American Facebook users) was taken using an app created for that purpose, designed to exploit Facebook's reckless policies that allowed data harvesting by third-party entities' apps.

50.     In or around 2013, Cambridge Analytica and/or its parent SCL approached researchers at Cambridge University's Psychometrics Centre, who had pioneered work on large-scale data analysis, who had used Facebook data concerning users' personality traits to predict "behaviour from online footprints."[16] Cambridge Analytica was interested in acquiring the data and the software used to harvest the Facebook user data.

51.     While the Centre and its key researchers apparently refused its overtures, Cambridge Analytica was able to enlist the aid of Aleksandr Kogan ("Kogan"), one of the researchers. Kogan created an app called "ThisIsYourDigitalLife," with Cambridge Analytica covering the more than $800,000 development costs of the app.  The app purported to be a

---

[15] *'I Made Steve Bannon's Psychological Warfare Tool': Meet The Data War Whistleblower,* The Guardian (March 18, 2018) https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump (last visited 4/4/18).

[16] *Cambridge Analytica Academic's Work Upset University Colleagues,* The Guardian, Mar. 24, 2108, *at* https://www.theguardian.com/education/2018/mar/24/cambridge-analytica-academics-work-upset-university-colleagues (last visited 3/30/18).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

personality quiz and was falsely billed as a "research app used by psychologists," but its real purpose was to harvest the Personal Information of Facebook users.

52.     In 2014, after the ThisIsYourDigitalLife app was successfully developed, Defendants advertised the app to Facebook users, and approximately 270,000 Facebook users participated in the "quiz."  As allowed by Facebook, the app used Facebook's API to access and acquire the Personal Information of those "participating" persons and also the Personal Information of some 87 million other Facebook users within their circles of Friends.[17]

> The data analytics firm that worked with Donald Trump's election team and the winning Brexit campaign harvested millions of Facebook profiles of US voters, in one of the tech giant's biggest ever data breaches, and used them to build a powerful software program to predict and influence choices at the ballot box.
>
> A whistleblower has revealed to the Observer how Cambridge Analytica – a company owned by the hedge fund billionaire Robert Mercer, and headed at the time by Trump's key adviser Steve Bannon – used personal information taken without authorization in early 2014 to build a system that could profile individual US voters, in order to target them with personalized political advertisements.
>
> Christopher Wylie, who worked with a Cambridge Analytica University academic to obtain the data, told the Observer: "We exploited Facebook to harvest millions of people's profiles. And built models to exploit what we knew about them and target their inner demons. That was the basis the entire company was built on."
>
> --Carole Cadwalladr and Emma Graham-Harrison, *Revealed: 50 Million Facebook Profiles Harvested For Cambridge Analytica In Major Data Breach,* The Guardian (March 17, 2018).

53.     In their March 17, 2018 exposè, the *New York Times* and *The Guardian* reported that Cambridge Analytica was still in possession of the Personal Information that it had illegally acquired from millions of Facebook users without their permission.

### Facebook Had Been Warned of such Data Breaches

### Violation of 2011 FTC Consent Decree

54.     At the time of the breach, Facebook was on notice of the dangers of such

---

[17] *See* https://www.facebook.com/zuck/posts/10104712037900071 (last visited March 26, 2018).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

breaches. In 2011, Facebook entered into a consent decree to settle an FTC case, pursuant to which Facebook was not to share users' personal information with other entities.[18] This was the result of charges brought by the FTC, charging that Facebook had engaged in "unfair and deceptive practices" by making public the private data of its users and by inappropriately sharing user data with advertisers and outside application developers.[19]

55.     Pursuant to the consent decree settling the 2011 FTC action, Facebook was to establish and maintain "a comprehensive privacy program" to address privacy risks and protect people's information.[20] The consent decree also required Facebook not to misrepresent to users the extent to which their data would be used. *Id.*

56.     On March 20, 2018, following news of the massive 2014 data breach, the FTC launched an investigation into whether Facebook violated the 2011 consent decree. If found guilty, Facebook could face fines up to $40,000 per violation per day, resulting in $2 trillion in fines.[21]

57.     Facebook was also criticized for a 2012 study involving a News Feed experiment designed to influence Facebook users' emotions. Nearly 700,000 users were subjected to this study without their explicit consent. This spurred widespread outrage privacy concerns by Facebook users, following which Facebook reportedly strengthened protections for users and added the "research policy" clause that was exploited in the ThisIsYourDigitalLife breach.

**Facebook's Knowledge of the Breach and Attempts to Conceal the Breach**

58.     Facebook learned of the breach soon after it occurred.  In or around 2015, Facebook learned that Kogan had shared data harvested using the ThisIsYourDigitalLife app with Cambridge Analytica. Yet, Facebook failed to inform its users whose Personal Information had been misappropriated and failed to inform the public. Instead, Facebook attempted to

---

[18] https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120810facebookdo.pdf (last visited 3/30/18).

[19] https://www.ftc.gov/sites/default/files/documents/cases/2011/11/111129facebookcmpt.pdf (FTC complaint against Facebook) (last visited 3/30/18).

[20] https://www.ftc.gov/sites/default/files/documents/cases/2011/11/111129facebookagree.pdf (last visited 3/30/18).

[21] *See* https://www.wired.com/story/ftc-facebook-data-privacy-investigation/ (last visted April 2, 2018).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

conceal the breach.

59.     According to Mark Zuckerberg's later admissions, since it was against Facebook's policies for app developers to share data, in 2015 Facebook demanded that Kogan and Cambridge Analytica certify that they had deleted all improperly acquired data. Facebook says Kogan and Cambridge Analytica provided the certifications; however, Facebook did nothing to verify that the purloined Personal Information had been deleted, which, in fact, did not take place.

60.     On or around April 30, 2015, in response to the breach, Facebook updated its platform to provide approved third party apps with less data, particularly about users' friends, and to offer users more control over what information would be shared with third-party apps.

61.     Facebook, however, made no effort to inform its users on a timely basis that their Personal Information was being, or had been, improperly harvested and misused.

62.     When *The Guardian* approached Facebook for comments as it was investigating the story, Facebook threatened *The Guardian* with legal action if it published news of the breach. Facebook now acknowledges the threat was "not our wisest move."[22]

63.     On March 19, 2018, in response to the *New York Time* and *The Guardian* stories revealing the Data Breach, which were based in part on information provided by former Cambridge Analytica employee and whistleblower Christopher Wylie, Facebook suspended Mr. Wylie's Facebook account.

64.     Because of Facebook's concealment of the breach and its scope, the March 17, 2018 news reports by the *New York Times* and *The Guardian* was the first notice Plaintiff and other consumers received that their Personal Information was improperly harvested and misused.

## Facebook's Belated Acknowledgement That It Betrayed Users' Trust

65.     Following the March 17, 2018 media reports, Facebook finally admitted the data breach and its extent.  On March 21, 2018, Facebook's CEO, Mark Zuckerberg, admitted that

---

[22] *Facebook News Head Says Threatening To Sue The Guardian Over Data Leak Was 'Not Our Wisest Move'*, CNBC, at https://www.cnbc.com/2018/03/22/facebook-says-threatening-to-sue-the-guardian-was-not-our-wisest-move.html (last visited 3/30/18).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

"[Facebook] made mistakes" and said it was "a breach of trust between Kogan, Cambridge Analytica and Facebook. But it was also a breach of trust between Facebook and the people who share their data with us and expect us to protect it. We need to fix that."[23] Mark Zuckerberg also admitted it had been "a mistake" to rely on Kogan and Cambridge Analytica's certifications that they had destroyed the improperly acquired data.

66.     According to Mark Zuckerberg, as a result of changes Facebook has implemented, "apps like Kogan's could no longer ask for data about a person's friends unless their friends had also authorized the app. We also required developers to get approval from us before they could request any sensitive data from people. These actions would prevent any app like Kogan's from being able to access so much data today."[24]

67.     However, Facebook has done nothing to recover the Personal Information that its third-party business partners improperly harvested before the changes to its app policies.

68.     Despite having been aware of the 2014 data breach since at least 2015 and having admitted that it made mistakes and breached the trust of its users, Facebook has still not individually notified its users whose Personal Information has been improperly harvested and misused, to provide them the details of the misuse of their Personal Information as required by law.

69.     The stolen Personal Information is still in the hands of Cambridge Analytica and/or other third-party entities and subject to illicit use.

> Portions of the Cambridge Analytica data on as many as 50 million Facebook users may still be out in the wild, according to a report yesterday from the UK's Channel 4 News. The news organization says it has seen a cache of data dating back to the 2014 survey results Cambridge Analytica University researcher Aleksandr Kogan collected with his app "thisisyourdigitallife." Kogan later sold that data to Cambridge Analytica, which had connections to the Trump campaign and may have used it to inform election ad targeting. The data in question here "details 136,000 individuals in the US state of Colorado, along with each person's personality and psychological profile," Channel 4 reports.

---

[23] *See* https://www.facebook.com/zuck/posts/10104712037900071 (last visited March 26, 2018).

[24] *See* https://www.facebook.com/zuck/posts/10104712037900071 (last visited March 26, 2018).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

This would appear to refute Cambridge Analytica's claims as the scandal unfolded over the last two weeks that it deleted the Facebook data back in 2015 and is not guilty of any wrongdoing.

. . . . .

Still, the full extent of Cambridge Analytica's actions remains murky, with the company's CEO Alexander Nix suspended and facing a "full, independent investigation" of his comments made to undercover Channel 4 journalists. Those comments detailed the firm's use of bribery, blackmail, and other unsavory techniques to compromise politicians and impact geopolitical situations on behalf of its clients.

 --Nick Statt, *Cambridge Analytica Reportedly Still Hasn't Deleted Facebook User Data As Promised,* The Verge (March 29, 2018).

### Further Revelations That Facebook Has Allowed "Malicious Actors" To "Scrape" the Personal Profile Information of Facebook's 2 Billion Users

70.    On April 4, 2018, in a startling further revelation with far-reaching implications, Facebook revealed that for years as-yet-unidentified "malicious actors" have been using Facebook search tools to "scrape" the personal profile information of "most" of Facebook's 2 billion users. Industry experts have said that, in fact, all Facebook users would have had their data taken in this described "scraping."

Facebook said Wednesday that "malicious actors" took advantage of search tools on its platform, making it possible for them to discover the identities and collect information on most of its 2 billion users worldwide.

The revelation came amid rising acknowledgement by Facebook about its struggles to control the data it gathers on users. Among the announcements Wednesday was that Cambridge Analytica, a political consultancy hired by President Trump and other Republicans, had improperly gathered detailed Facebook information on 87 million people, of whom 71 million were Americans.

But the abuse of Facebook's search tools -- now disabled -- happened far more broadly and over the course of several years, with few Facebook users likely escaping the scam, company officials acknowledged. [25]

---

[25] *Facebook: 'Malicious Actors' Used Its Tools To Discover Identities And Collect Data On A Massive Global Scale,* Washington Post, *at* https://www.washingtonpost.com/news/the-switch/wp/2018/04/04/facebook-said-the-personal-data-of-most-its-2-billion-users-has-been-collected-and-shared-with-outsiders/?utm_term=.275ea19a3c4a (last visited 4/4/18).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

71.     Taking advantage of vulnerabilities in the Facebook platform that privacy experts had warned could be used to steal data, these as-yet-unidentified hackers were able to obtain Facebook users' personal information including names, addresses and telephone numbers, correlating data and building identity kits that could potentially be used for identity theft, according to the reports:

> Names, phone numbers, email addresses and other personal information amount to critical starter kits for identity theft and other malicious online activity, experts on Internet crime say. The Facebook hack allowed bad actors to tie raw data to people's real identities and build fuller profiles of them.

> Privacy experts had issued warnings that the phone number and email address lookup tool left Facebook users' data exposed.[26]

72.     In essence, Facebook provided hackers and identity thieves with powerful tools and a treasure trove of data.  Using incomplete personal information already stolen and available on the "dark web," hackers and identity thieves have been using Facebook to correlate that information with Facebook users' information to construct complete identity profiles that can be used for identity theft and fraud:

> The scam started when malicious hackers harvested email addresses and phone numbers on the so-called "Dark Web," where criminals post information stolen from data breaches over the years. Then the hackers used automated computer programs to feed the numbers and addresses into Facebook's "search" box, allowing them to discover the full names of people affiliated with the phone numbers or addresses, along with whatever Facebook profile information they chose to make public, often including their profile photos and hometown.[27]

73.     Facebook has not yet disclosed the identities of the "malicious actors," exactly what personal information was taken, or how the stolen personal information was used. Facebook said it has disabled the tools used for the data theft and has taken other measures to improve security. However, as shown by the 2011 FTC consent decree, Facebook has a history

---

[26] *Id.*

[27] *Id.*

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1    of promising to improve protections for its users' data and not fulfilling its promises.

2    **<u>Plaintiff and the Class Have Suffered an Injury in Fact That Will</u>**
3    **<u>Endanger Them For Many Years to Come, If Not Forever</u>**

4        74.     As a result of the data theft, Plaintiff's and Class members profile and Personal

5    Information is now in the hands of Cambridge Analytica, Kogan, and other unknown parties, and

6    Plaintiff and the Classes now face an imminent heightened, and substantial risk of identity theft

7    and other fraud, which is a concrete and particularized injury traceable to Defendants' conduct.

8    Accordingly, Plaintiff and the Class have suffered "injury-in-fact."  *See Attias v. CareFirst, Inc.*,

9    865 F.3d 620 (D.C.Cir. 2017).

10       75.     Experts say that that the stolen Personal Information has likely already "spread to

11   other groups, databases and the dark Web," making it difficult or impossible to recover the data

12   and protect it from further misuse. "Paul-Olivier Dehaye, a privacy expert and co-founder of

13   PersonalData.IO, said he suspects the data has already proliferated far beyond Cambridge's

14   reach. 'It is the whole nature of this ecosystem,' Dehaye said. 'This data travels. And once it has

15   spread, there is no way to get it back.'"[28]

16       76.     Theft of personal information is a serious and growing problem in the United

17   States. The 2017 Identity Fraud Report by Javelin Strategy & Research reports that, "2016 will

18   be remembered as a banner year for fraudsters as numerous measures of identity fraud reached

19   new heights."  According to Javelin, the overall identity fraud incidence rose 16% to affect

20   6.15% of U.S. consumers—the highest on record--with 15.4 million U.S. identity theft victims,

21   who lost a total of $16 billion.

22       77.     Identity theft is a growth industry. As tracked by the Consumer Sentinel Network,

23   maintained by the Federal Trade Commission, of the 3.1 million consumer fraud complaints filed

24   with law enforcement and private agencies in 2015, 16 percent related to identity theft, with

25   identity theft complaints increasing by more than 47 per cent from 2014.

26       78.     According to a Javelin study, there is a high correlation between having

27   ───────────────

28   [28] *Why Facebook Users' Data Obtained By Cambridge Analytica Has Probably Spun Far Out Of Reach,* The
     Washington Post, Mar. 22, 2018, *at* https://www.washingtonpost.com/news/the-switch/wp/2018/03/22/why-
     facebook-users-data-obtained-by-cambridge-analytica-has-likely-spun-far-out-of-reach/?utm_term=.b9a50e4da142
     (last visited 4/4/18).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

information taken in a data breach and becoming an identity theft victim, with nearly 1 in 4 data breach letter recipients becoming an actual victim of identity fraud.

79.     Identity theft victims must spend countless hours and money repairing the impact to their good name and credit record.  Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, tax fraud, and bank/finance fraud.

80.     It can be expensive for consumers to rectify identify theft.  A recent report sponsored by Experian states that the "average total cost to resolve an identity theft-related incident … came to about $20,000."  Forty percent of consumers said they were never able fully to resolve their identity theft.

81.     Identity theft crimes often involve more than financial loss, causing harm such as loss of reputation, adverse credit reports, and even criminal records. Identity thieves can use the victim's identity to obtain a driver's license or other licenses; commit fraud and other crimes exposing the victim to arrest; and create adverse employment, house rental and other history for the victim.

82.     It is also a crime that has effects far beyond the date of the theft. A person whose personal information has been compromised may not see any signs of identity theft for years. According to the GAO Report: "stolen data may be held for up to one year or more before being used to commit identity theft."

83.     Identity theft criminals can easily sell or trade the stolen personal information on the cyber black-market.  There are web sites where the stolen information is marketed surprisingly freely, according to industry sources. [29] There are also more clandestine web sites, unlisted by search engines and based in foreign countries, and on the so-called "dark web," where blocks of stolen identity information are traded or sold to anonymous buyers. Often the transactions are in bitcoin or utilize other untraceable methods of payment.

84.     Plaintiff and the Classes have also been "injured in fact" in that their valuable personal, private information was misappropriated, used and sold for profit by the Defendants in

---

[29] *See* http://www.stopthehacker.com/2010/03/03/the-underground-credit-card-blackmarket/ (last visited April 2, 2018).

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

an illicit enterprise to propagandize and influence the election process, which is a concrete and particularized injury traceable to Defendants' conduct.  Defendants misappropriated and misused the personal and private information for their own personal gain without the consent of, or any remuneration to, Plaintiff and the Classes.

85.     Finally, Plaintiff and the Classes have been "injured in fact" in that they have been subjected to unwanted political advertising, targeted specifically to them and designed to mislead them in the free and unfettered exercise of their constitutionally protected right to vote, which is a concrete and particularized injury traceable to Defendants' conduct.

86.     For all of the above reasons, Plaintiff and the Classes have suffered harm; and there is a substantial risk of additional injury to Plaintiff and members of the Classes that is imminent and concrete and that will continue for years to come.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action on behalf of herself and two classes of Facebook users: a 2014 Data Breach Class and a Scraping Class (together "Classes").[30]

88.     The 2014 Data Breach Class is initially defined as follows:

**"All Facebook users in the United States whose Facebook profile information was acquired by Cambridge Analytica in June-August 2014."**

Excluded from the 2014 Data Breach Class are Defendants, their corporate parents, subsidiaries, officers, directors, employees, and partners.

89.     The Scraping Class is initially defined as follows:

**"All Facebook users in the United States whose personal or profile information was taken by third parties using Facebook search tools."**

Excluded from the Scraping Class are Defendants, their corporate parents, subsidiaries, officers, directors, employees, and partners.

90.     Plaintiff reserves the right to seek to amend these class definitions or to define classes and subclasses as required, based on the investigation and research of her counsel.

91.     This action has been properly brought and may properly be maintained as a class

---

[30] If not otherwise clear from the context, "Class" not preceded by "2014 Data Breach" or "Scraping" means and includes both Classes.

22

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

action under Rule 23(a)(1-4), Rule 23(b)(1), (2) or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure and case law thereunder.

<strong><u>Numerosity of the Classes</u></strong>

<strong>(Fed. R. Civ. P. 23(a)(1))</strong>

92.     Members of each Class are so numerous that their individual joinder is impractical. The Classes comprise many millions of people. The precise number of the members of each Class, and their addresses, are unknown to Plaintiff at this time, but can be ascertained from Defendants' records.  Members of the Classes may be notified of the pendency of this action by mail or email, supplemented (if deemed necessary or appropriate by the Court) by published notice, including notice published on Facebook.

<strong><u>Predominance of Common Questions of Fact and Law</u></strong>

<strong>(Fed. R. Civ. P. 23(a)(2); 23(b)(3))</strong>

93.     Common questions of law and fact exist as to all members of the Classes.  These questions predominate over the questions affecting only individual members of the Classes.  The common legal and factual questions include, without limitation:

(a)     Whether Facebook represented that its users' profile and personal information in its custody was secure when in fact it was not;

(b)     Whether Facebook failed to disclose that profile and personal information entrusted to it was at risk of being improperly "scraped," harvested and/or misused owing to Facebook's inadequate security procedures or reckless policies;

(c)     Whether, Facebook failed to maintain reasonable procedures designed to limit the furnishing of its users' profile and Personal Information to other entities;

(d)     Whether Facebook failed to implement and maintain reasonable security measures and procedures, appropriate to the information in its custody, to safeguard Class members' personal information, in violation of California Civil Code section 1798.81.5(b);

(e)     Whether Defendants misappropriated Class members' data.

(f)     Whether Defendants were negligent in the access, handling and protection of Class members' personal information;

23

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

(g)    Whether Facebook negligently failed to warn members of the Classes of dangers with respect to the sharing of or third-party access to their profile and personal data.

(h)    When Facebook became aware of the 2014 Data Breach;

(i)    When Facebook became aware of the "scraping" of user data using Facebook search tools;

(j)    Whether Defendants notified Class members of the taking of their data by other entities without unreasonable delay as required by California Civil Code section 1798.82;

(k)    Whether Defendants' practices, actions and omissions constitute unlawful, fraudulent and/or unfair business practices in violation of California Business and Professions Code section 17200 *et seq.*;

(l)    Whether Defendants were negligent with respect to the safekeeping of the profile and Personal Information in their possession;

(m)    Whether Defendants are liable for unjust enrichment; and

(n)    The nature of the relief, including damages and equitable relief, to which Plaintiff and members of the Classes are entitled.

### **Typicality of Claims**

### **(Fed. R. Civ. P. 23(a)(3))**

94.    Plaintiff's claims are typical of the claims of the Classes because Plaintiff, like all other Class members, had her Personal Information in Defendant Facebook's custody exposed in the security breach.

### **Adequacy of Representation**

### **(Fed. R. Civ. P. 23(a)(4))**

95.    Plaintiff is an adequate representative of the Classes, because her interests do not conflict with the interests of the members of the Classes and she has retained counsel competent and experienced in complex class action and consumer litigation.

96.    The interests of the members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

24

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**Superiority of a Class Action**

**(Fed. R. Civ. P. 23(b)(3))**

97.     A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and members of the Classes.  The damages suffered by each individual members of the Classes, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  Further, it would be virtually impossible for the members of the Classes individually to redress effectively the wrongs done to them.  And, even if members of the Classes themselves could afford such individual litigation; the court system could not, given the thousands or even millions of cases that would need to be filed.  Individualized litigation would also present a potential for inconsistent or contradictory judgments.  Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**Risk of Inconsistent or Dispositive Adjudications and the Appropriateness**

**of Final Injunctive or Declaratory Relief**

**(Fed. R. Civ. P. 23(b)(1) And (2))**

98.     In the alternative, this action may properly be maintained as a class action with respect to each Class, because:

(a)     the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for the Defendants; or

(b)     the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

99.     (c)     Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with

25

1   respect to each Class as a whole.

2

3                            **Issue Certification**

4                          **(Fed. R. Civ. P. 23(c)(4))**

5        100.    In the alternative, common questions of fact and law, including those set forth in

6   Paragraph 93 above, are appropriate for issue certification.

7                          **FIRST CAUSE OF ACTION**

8        **(Violation of the Stored Communication Act, 18 U.S.C § 2701,** *et seq.*

9               **(Against Facebook and Cambridge Analytica)**

10       101.    Plaintiff realleges, as if fully set forth, each and every allegation set forth above.

11       102.    Defendant Facebook is an electronic communication provider within the meaning

12  of the Stored Communication Act, 18 U.S.C § 2701, *et seq.* ("SCA").

13       103.    By their actions complained of herein, Defendants have violated the SCA.

14       104.    Defendants and each of them have violated the SCA by, among other things,

15  intentionally accessing without authorization a facility through which an electronic

16  communication service was provided, and/or intentionally exceeding an authorization to access

17  that facility; and thereby obtained access to electronic communication while it was in electronic

18  storage in such system.

19       105.    Defendants and each of them exceeded any authorization to use Plaintiff's and

20  Class members' stored electronic communications by allowing third parties to have access to

21  Plaintiff's and Class members' stored electronic communications, including their profile and

22  Personal Information.

23       106.    Plaintiff and Class members have been damaged by Defendants' violations of the

24  SCA.

25       107.    Accordingly, Plaintiff and Class members are entitled to relief including

26  compensatory and statutory damages, punitive damages, preliminary and injunctive relief, and

27  attorneys' fees and costs, as prayed for hereunder.

28

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECOND CAUSE OF ACTION

**(Violation of the Electronic Communications Privacy Act, 18 U.S.C §§ 2511 et *seq.*)**

**(Against Facebook and Cambridge Analytica)**

108.    Plaintiff realleges, as if fully set forth, each and every allegation set forth above.

109.    By their actions complained of herein, Defendants have violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.* ("ECPA").

110.    The ECPA protects electronically transmitted and stored communications and data and has as its purposes safeguarding "the privacy expectations of citizens."

111.    Plaintiff and Class members used Facebook to communicate and share information with friends, family, and colleagues through posts, writings, images and other intelligence, and through their Personal Information, which is electronic communications and protected by the ECPA, which protects "any transfer of signs, signals, writing, images, sound, data, or intelligence of any nature . . . " 18 U.S.C. § 2510(12).

112.    Defendants and each of them violated the ECPA by, among other things, intentionally intercepting or acquiring and/or procuring other persons to intercept or acquire electronic information and communication belonging to and between Plaintiff and members of the Classes, in violation of  18 U.S.C. § Section 2511(1)(a).

113.    Defendants violated the ECPA by, among other things, intentionally disclosing to other persons the contents of electronic communication, knowing or having reason to know that the information was obtained through the interception of electronic communication in violation of 18 U.S.C. § 2511(1)(c), and/or intentionally disclosing to other persons the contents of electronic communication knowing or having reason to know that the information was obtained through the interception of electronic communication in violation of 18 U.S.C. § 2511(1)(d).

114.    Defendants and each of them had no lawful justification for their actions, and Plaintiff and Class members did not consent to Defendants' actions complained of herein.

115.    Accordingly, Plaintiff and Class members are entitled to relief including compensatory and statutory damages, punitive damages, preliminary and injunctive relief, and attorneys' fees and costs, as prayed for hereunder.

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### THIRD CAUSE OF ACTION

**(Violation of the Security Breach Notification Law, Cal. Civil Code § 1798.82)**

**(Against Facebook)**

116.     Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

117.     Facebook's acts and omissions violate the Security Breach Notification Law, Cal. Civil Code § 1798.82 et *seq.*

118.     Facebook conducts business in California and owns or licenses digital data including, within the meaning of Cal. Civ. Code § 1798.82(h), the Personal Information of California residents, including Plaintiff.

119.     Facebook's information security systems were breached, resulting in the unauthorized use of Plaintiff's and Class members' profile and Personal Information; yet, Facebook has failed to timely and properly disclose the data breach to Plaintiff and Class members.

120.     Facebook learned of the 2014 Data Breach in or around 2015, and perhaps earlier, but has failed to send Plaintiff and individual Class members timely written notice as required by Cal. Civ. Code § 1798.82, and has failed to provide the information required by law.

121.     By failing to timely disclose to Plaintiff and each member of the Class in the most expedient manner possible that their profile and Personal Information has been acquired by an unauthorized person, Facebook violated Cal. Civ. Code § 1798.82.

122.     There was no lawful reason for the delay in notifying Plaintiff and Class members of the data breach and providing the information required by Cal. Civ. Code § 1798.82.

123.     As a direct and proximate result of Facebook's violations of Cal. Civ. Code § 1798.82, Plaintiff and Class members have suffered harm and damages.

124.     Plaintiff and members of the Classes are therefore entitled to damages, injunctive relief, and attorneys' fees and costs as prayed for hereunder.

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**FOURTH CAUSE OF ACTION**

**(Violation of the Customer Records Act, Cal. Civ. Code § 1798.80)**

**(Against Facebook)**

125.    Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

126.    Facebook's acts and omissions violate the California Customer Records Act, Cal. Civ. Code § 1798.80 et *seq.*

127.    Facebook is a business that owns or licenses personal information about California residents within the meaning of Cal. Civ. Code § 1798.81.5.

128.    By failing to implement and maintain appropriate and reasonable security procedures and practices to protect the profile and Personal Information of Plaintiff and the Classes from unauthorized access and disclosure, Facebook violated Cal. Civ. Code § 1798.81.5.

129.    As a result of Facebook's violation of Cal. Civ. Code § 1798.81.5, Plaintiff and Class members have been injured.

130.    Plaintiff and members of the Classes are therefore entitled to damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to § 1798.84, as prayed for hereunder.

**FIFTH CAUSE OF ACTION**

**(For Negligence and Negligent Failure to Warn)**

**(Against Facebook)**

131.    Plaintiff realleges, as if fully set forth herein, each and every allegation set forth above.

132.    The actions of Defendant constitute negligence and/or negligent failure to warn.

133.    Defendant owed a duty of care to Plaintiff and members of the Classes to exercise reasonable care in obtaining and protecting their profile and Personal Information, and keeping it from being compromised, misused, lost, stolen, and/or disclosed to unauthorized parties. Defendant breached that duty by failing to take appropriate and adequate security measures to protect and secure Plaintiff's and the Classes' profile and Personal Information.

134.    When Plaintiff and members of the Classes registered for Facebook's services and provided their profile and Personal Information, they had the reasonable belief that Facebook

29

would take appropriate and adequate measures to secure and protect their information, and would warn them of dangers and inform them of any breaches or other security concerns that might call for action by them. In violation of that duty, Facebook failed to warn them of dangers inherent in its network and/or the default configuration of its system and/or their accounts and failed to prevent third parties including hackers, third parties and Cambridge Analytica from improperly obtaining Plaintiff's and the Classes' profile and Personal Information.

135.    Among other things, Facebook failed to warn Plaintiff and members of the Classes that their profile and Personal Information entrusted to Facebook was not properly protected and that Facebook did not maintain the security procedures and measures reasonable necessary to protect such data from unauthorized access and use by hackers and third parties.

136.    Among other things, Facebook failed to implement and maintain the security procedures, measures and protocols reasonable necessary to protect Plaintiff's and Class members' profile and Personal Information from unauthorized access and use by hackers, third parties and Cambridge Analytica.

137.    Among other things, Facebook maintained known security vulnerabilities in its system, including APIs and search tools, which could be used by hackers and third party entities to "harvest" the personal information of users.

138.    Among other things, Facebook failed to notify Plaintiff and members of the Classes in a timely manner that their profile and Personal Information had been taken by third parties and of the danger to them caused by the data breach and misappropriation of their profile and Personal Information.

139.    As a direct and proximate result of the practices, acts and omissions alleged herein, Plaintiff and members of the Classes have suffered injury and damages.

140.    At all relevant times, Plaintiff and members of the Classes acted lawfully and with due care and did not contribute to the injuries suffered.

141.    Plaintiff and members of the Classes are entitled to damages and other relief, as prayed for hereunder.

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

## SIXTH CAUSE OF ACTION

**(Violations of the Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*)**

**(Against Facebook and Cambridge Analytica)**

142.    Plaintiff realleges, as if fully set forth herein, each and every allegation set forth above.

143.    Defendants' business practices as complained of herein violate the Unfair Competition Law, Cal. Bus. & Prof. Code sections 17200, *et seq.* ("UCL").

144.    Defendants' practices constitute "unlawful" business practices in violation of the UCL because, among other things, they violate statutory law and the common law, including without limitation the Stored Communication Act, 18 U.S.C § 2701, *et seq.*, the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, the Security Breach Notification Law, Cal. Civil Code § 1798.82 et *seq.* (Facebook), and the California Customer Records Act, Cal. Civ. Code § 1798.80 et *seq.* (Facebook).

145.    Defendants' actions and practices constitute "unfair" business practices in violation of the UCL, because, among other things, they are immoral, unethical, oppressive, unconscionable, unscrupulous or substantially injurious to consumers, and/or any utility of such practices is outweighed by the harm caused consumers.

146.    Defendants' actions and practices constitute "fraudulent" business practices in violation of the UCL because, among other things, they have a capacity and tendency to deceive members of the public.

147.    As a result of Defendants' wrongful business practices, Plaintiff and members of the Classes have suffered injury in fact.

148.    Defendants' wrongful business practices present an ongoing and continuing threat to the general public.

149.    Accordingly, Plaintiff and members of the Classes are entitled to relief, as prayed for hereunder.

31

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SEVENTH CAUSE OF ACTION

### (Misappropriation of Valuable Property Without Compensation)

### (Against Facebook and Cambridge)

150.    Plaintiff realleges, as if fully set forth herein, each and every allegation set forth above.

151.    Defendants' actions constitute misappropriation.

152.    Defendants and each of them used Plaintiff's and Class members' valuable personal and private information in violation of Facebook's promises to protect their privacy.

153.    Plaintiff and Class members did not consent to this use.

154.    Defendants and each of them gained a commercial benefit by using Plaintiff's and Class members' valuable personal and private information when Defendants misappropriated, used, and/or sold for profit Plaintiff's and Class members' valuable personal and private information.

155.    Plaintiff and members of the Classes were harmed.

156.    Defendants' conduct and the conduct of each of them was a substantial factor in causing Plaintiff's and Class members' harm.

157.    Accordingly, Plaintiff and members of the Classes are entitled to relief, as prayed for hereunder.

## EIGHTH CAUSE OF ACTION

### (Unjust Enrichment)

### (Against Facebook and Cambridge)

158.    Plaintiff realleges, as if fully set forth, each and every allegation set forth above.

159.    Plaintiff and Class members conferred a benefit upon Defendants.

160.    Plaintiff and members of the Class had their profile and Personal Information, which had commercial value, stored on Facebook's network.

161.    Defendants and each of them realized monetary benefit from the profile and Personal Information.

32

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

162.     Defendants retained that benefit under circumstances that make it inequitable for them to retain such benefit. Specifically, Defendants retained that benefit for themselves without the consent of, or any remuneration to, Plaintiff and members of the Classes.

163.     Plaintiff and members of the Classes are therefore entitled to relief, including disgorgement and/or restitution, as prayed for hereunder.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Classes pray for relief and judgment against Defendants, as follows:

A.     Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as representative of the Classes and designating her counsel as counsel for the Classes;

B.     Awarding Plaintiff and the Classes compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

C.     Awarding Plaintiff and the Classes statutory damages;

D.     Awarding Plaintiff and the Classes punitive damages;

E.     For preliminary relief to protect the profiles and Personal Information of Plaintiffs and members of the Classes against further misuse;

F.     For declaratory and equitable relief, including restitution and disgorgement;

G.     For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

H.     For injunctive relief, including without limitation requiring Defendants to take steps to repair the injury caused by their wrongful conduct;

I.     Awarding Plaintiff and the Classes the costs of prosecuting this action, including expert witness fees;

J.     Awarding Plaintiff and the Classes reasonable attorney fees;

K.     Awarding pre-judgment and post-judgment interest; and

L.     Granting such other relief as this Court may deem just and proper.

33

1

## **DEMAND FOR JURY TRIAL**

2       Plaintiff Christina Labajo hereby demands trial by jury of all claims so triable.

3

4                                        Respectfully submitted,

5    Date:  April 5, 2018               By: /s/ Gordon M. Fauth, Jr._____

6                                           Gordon M. Fauth, Jr.
                                            Of Counsel
7                                           Rosanne L. Mah
                                            Of Counsel
8                                           **FINKELSTEIN THOMPSON LLP**

9                                           100 Pine Street, Suite 1250
                                            San Francisco, California 94111
10                                          Direct Telephone: (510) 238-9610
                                            Telephone: (415) 398-8700
11                                          Facsimile:  (415) 398-8704

12
                                            Attorneys for Individual and Representative
13                                          Plaintiff Christina Labajo

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF